A06A0782. STEWART v. THE STATE.
(634 SE2d 141)

ADAMS, Judge.

Chaka Rashad Stewart appeals from his conviction on one count of driving with an unlawful alcohol concentration and one count of driving under the influence of alcohol in violation of OCGA § 40-6-391.

Viewed in the light most favorable to support the verdict, the evidence showed that early on the morning of June 20, 2004, Officer Robert Adair of the Decatur Police Department saw Stewart run a red light at the intersection of Clairmont Avenue and Scott Boulevard in DeKalb County. The officer initiated a traffic stop and noticed that Stewart's brake lights were inoperable when he pulled to a stop. After approaching the car and speaking with Stewart, Officer Adair detected a strong odor of alcohol coming from Stewart's person. He also observed that Stewart had droopy eyelids and small pupils. And when Stewart exited his car, he walked slowly and methodically, using the vehicle to brace himself so that he would not lose his balance. The officer asked Stewart if he had been drinking, and he said that he had a few drinks earlier in the evening at a wedding.

Officer Adair administered field sobriety tests and determined that Stewart exhibited four of the six possible clues on the horizontal

gaze nystagmus (HGN) test; four out of eight clues on the walk and turn test, and two out of four clues on the one-leg stand test. Stewart also tested positive on the alco-sensor for the presence of alcohol. The officer determined, based upon these results and his own training and experience, that Stewart was a less safe driver and arrested him for DUI and other traffic offenses.

After Officer Adair read Stewart the implied consent warning, he consented to take a breath test. He was transported to the county jail where the officer administered a breath test on an Intoxilyzer 5000 machine. Stewart's blood alcohol content measured 0.140 grams on the first test and 0.141 grams on the second.

1. Stewart contends that the trial court erred in denying his motion to suppress the results of his Intoxilyzer 5000 tests because, he argues, the Intoxilyzer 5000 as used in Georgia does not meet the requirements for admissibility as scientific evidence under *Harper v. State*, 249 Ga. 519, 525 (292 SE2d 389) (1982). Stewart bases this argument on his expert's testimony that an officer administering the test can visually observe the test readings and manipulate them by giving verbal instructions to the test subject to ensure that the two breath samples match within the 0.02 agreement required by OCGA § 40-6-392.

But 15 years ago, the Supreme Court of Georgia held that results from the Intoxilyzer 3000, predecessor to the Intoxilyzer 5000 used in this case, meet the standard for admissibility as scientifically reliable evidence under *Harper* and its progeny. *Lattarulo v. State*, 261 Ga. 124, 126-127 (3) (401 SE2d 516) (1991). Stewart fails to cite to *Lattarulo*, and makes no effort to distinguish the case. Rather, he relies upon the testimony of his expert to argue that the results of his breath tests should be excluded because the Intoxilyzer 5000 test has some margin of error. But as the Supreme Court noted in *Lattarulo*, "no procedure is infallible. An accused may always introduce evidence of the possibility of error or circumstances that might have caused the machine to malfunction. Such evidence would relate to the weight rather than the admissibility of breathalyzer results." Id. at 126 (3). Accordingly, Stewart's argument goes to the weight of the evidence, not its admissibility, and that issue was for determination by the trial court acting as factfinder. *Whittaker v. State*, 279 Ga. App. 148, 150-151 (3) (630 SE2d 560) (2006) (rejecting a similar argument regarding the Intoxilyzer 5000).

2. Stewart next argues that Officer Adair did not administer the field sobriety tests in the standardized manner, which compromised their reliability, rendering them inadmissible under *Harper*.[1] He

---

[1] Stewart asserts this argument as his second enumeration of error in the body of his brief.

asserts that although Officer Adair was required to administer the field sobriety tests under National Highway Traffic Safety Administration (NHTSA) guidelines, the officer is not NHTSA-certified. He also contends that the officer failed to comply with the guidelines for administering the tests because (1) the surface upon which the tests were performed was not smooth and level; (2) Officer Adair refused to allow Stewart to remove his shoes, which were not appropriate for performing the evaluations; (3) he failed to take into account Stewart's height and weight in evaluating his performance; and (4) the officer failed to ask Stewart if he had any medical conditions that might affect the validity of the tests. He notes that his expert testified that failing to ask about such medical conditions could compromise the tests. Stewart's father and the passenger in the car that night also testified that Stewart had previously undergone two knee surgeries, the last six years prior to the incident, and had problems with his neck.

While Officer Adair was not NHTSA-certified, he stated that he was a POST-certified[2] officer, with training in the standardized field sobriety tests from a certified NHTSA instructor. Additionally, he had attended a drug recognition expert course. He testified that he had used his POST training to make over 200 DUI arrests in the last four years and had administered field sobriety tests over 500 times. Officer Adair stated that in administering the field sobriety tests to Stewart, he attempted to follow his training precisely.

As an initial matter, we note that Stewart failed to cite any authority requiring that an officer be NHTSA-certified before administering field sobriety evaluations. Because Officer Adair's testimony demonstrates that he had NHTSA-specific training and extensive experience in performing these tests, we conclude that his lack of NHTSA certification is not a ground for excluding the field sobriety evidence in this case.

Moreover, this Court has held that the walk and turn test and the one-leg stand test are not subject to the requirements of *Harper* to determine their admissibility. *Hawkins v. State*, 223 Ga. App. 34, 36 (1) (476 SE2d 803) (1996). Accordingly, Stewart's arguments regarding the proper administration of these tests go to the weight of

---

In the enumeration of errors portion of the brief, however, he makes no reference to this issue. Instead, in that portion of the brief, he asserts as his second enumeration of error that Officer Adair lacked reasonable articulable suspicion of criminal activity to support his arrest, but provides no argument on this issue. Therefore, under Court of Appeals Rule 25 (c) (2), we will deem abandoned the issue of the propriety of his arrest and will address this argument as his second enumeration of error.

[2] POST is an abbreviation for the Georgia Peace Officer Standards and Training Council.

the evidence from these tests and not to its admissibility. See *Keller v. State*, 271 Ga. App. 79, 81 (2) (608 SE2d 697) (2004); *Hawkins*, 223 Ga. App. at 38 (1).[3]

The HGN test, on the other hand, is subject to the *Harper* standard. While no expert testimony is required to establish the scientific validity and reliability of the HGN test in general, this Court has recently clarified that for the results of the test to be admissible, the state must establish that the administrator substantially performed the test in an acceptable manner. *State v. Tousley*, 271 Ga. App. 874, 879 (1) (b) (ii) (611 SE2d 139) (2005).

Stewart raises no issue with regard to Officer Adair's physical administration of the test, and the officer testified that he endeavored to administer the test precisely in conformity with his training. Rather, Stewart asserts as his ground for excluding this evidence the fact that Officer Adair did not ask him whether he had any head injuries before performing the test, a question his expert identified as a standard screening procedure. Stewart's expert further explained that part of the screening process is to check for equal tracking of the subject's pupils to determine whether some kind of head injury or neurological disorder was present. While Officer Adair did not ask the screening question, he testified that he did check Stewart's eyes for equal tracking and determined that he passed that screening.

"In reviewing a trial court's decision on a motion to suppress, our responsibility is to ensure that there was a substantial basis for its decision." (Footnote omitted.) *Keller v. State*, 271 Ga. App. at 80 (2). We find that the trial court had a substantial basis for concluding that Officer Adair substantially complied with the law enforcement guidelines for administering the HGN test and thus for concluding that the results of the HGN test were admissible. *State v. Tousley*, 271 Ga. App. at 880 (1) (b) (ii); *Keller v. State*, 271 Ga. App. at 81 (2). Any arguments regarding whether Stewart's medical conditions affected his performance on the test, address the weight of the evidence, not its admissibility. Id.

3. Stewart also asserts that rules, policies and procedures promulgated by the Division of Forensic Sciences (DFS) of the Georgia Bureau of Investigation (GBI) to regulate the production of breath

---

[3] In any event, we note that the evidence does not necessarily support Stewart's arguments regarding the administration of these tests. For example, Officer Adair testified that conditions of the testing area were level at the time he administered the walk and turn test and the one-leg stand test, although he acknowledged that they may not have been precisely level to allow for water drainage from the roadway. He also stated that his standard question before administering the agility tests was whether the subject had any problems with his knees or ankles. He stated he asked Stewart that question and he replied in the negative. In addition, there is no testimony that he prevented Stewart from removing his shoes although he stated that he did not offer Stewart the option of removing his shoes.

test certificates to prove an Intoxilyzer 5000 machine is in proper working order are inadequate and insufficient to secure the certificate's reliability. He also asserts that the GBI failed to comply with its own inspection and calibration procedures on the Intoxilyzer 5000 used in this case, and that this failure does not comport with due process of law. Thus, Stewart contends that the trial court erred in admitting the results of his tests into evidence.

Under OCGA § 40-6-392 (a) (1) (A), in order to be admissible into evidence, all breath tests must be "performed according to methods approved by the Division of Forensic Sciences of the Georgia Bureau of Investigation" on a machine in good working order, with its prescribed parts attached, and administered by an individual with a valid permit. Here, the certificates introduced into evidence showed that the Intoxilyzer 5000 had been tested on May 18, 2004 before it was used on Stewart on June 20, 2004, and was tested again on August 24, 2004, and at those times all of the machine's parts were attached and in good working order.[4] Officer Adair testified that machine did not appear to be missing any parts and appeared to be functioning properly at the time he used it on Stewart. Further, the evidence established that he was certified by DFS as an Intoxilyzer 5000 operator and possessed a valid permit at the time he performed the tests on Stewart. Officer Adair stated that the methods he used to perform the tests on Stewart were approved by DFS. See *Scara v. State*, 259 Ga. App. 510, 512 (577 SE2d 796) (2003) (compliance with requirements of OCGA § 40-6-392 (a) (1) (A) may be proved through oral testimony of the individual who conducted the test). Accordingly, we find that the state properly established the admissibility of these breath tests results under the statute.

(a) But Stewart argues that this evidence was insufficient to admit the test results into evidence because DFS's rules and regulations do not meet the statutory standard for establishing satisfactory inspection rules. In connection with the requirements noted above, OCGA § 40-6-392 (a) (1) (A) requires DFS to approve:

satisfactory techniques or methods to ascertain the qualifications and competence of individuals to conduct analyses and to issue permits, along with requirements for properly operating and maintaining any testing instruments, and to issue certificates certifying that instruments have met those requirements. . . .

---

[4] OCGA § 40-6-392 (f) provides that Intoxilyzer inspection certificates, "[w]hen properly prepared and executed, as prescribed in this subsection, . . . shall, notwithstanding any other provision of law, be self-authenticating, shall be admissible in any court of law, and shall satisfy the pertinent requirements of paragraph (1) of subsection (a) of this Code section. . . ."

Stewart contends that DFS's rules and regulations do not meet the statutory standard because the Intoxilyzer 5000 machines in Georgia are configured to disallow the machine to download and retrieve old test results.

In *Dougherty v. State*, 259 Ga. App. 618, 621-622 (1) (c) (578 SE2d 256) (2003), this Court considered a challenge to the adequacy of DFS's rules. The *Dougherty* court determined that the rules as promulgated complied with the requirements of OCGA § 40-6-392 (a) (1) (A). Id. Although Stewart raises a somewhat different challenge to the rules, we find that he has failed to establish that an additional requirement that the Intoxilyzer machine be able to download and print prior results was necessary to establish that the results are admissible under OCGA § 40-6-392 (a) (1) (A). Rather, we find that Stewart's arguments with regard to the configuration of the Intoxilyzer machines in Georgia go to the weight of the Intoxilyzer evidence, and the trial court did not err in refusing to suppress the Intoxilyzer 5000 test results on this ground. Id.

(b) Stewart also contends that the certificates of inspection are inadmissible because DFS failed to follow its own procedures in inspecting the Intoxilyzer 5000. Specifically, he asserts that the state failed to produce test cards for certain of the required tests during the certification process or a printout showing the ability of the machine to recall the last test that was administered and to print a new card. In support of this argument, Stewart introduced several pages from DFS's internal Informed Consent Manual purporting to outline the procedures to be followed for inspecting Intoxilyzer machines, although he produced no evidence establishing how DFS utilizes this manual.[5]

But even assuming, arguendo, that this internal manual sets the applicable standard for inspections, we find no error in the admission of the Intoxilyzer evidence because the state's evidence established substantial compliance with the manual's procedures. Attached to each certificate of inspection introduced into evidence were printouts showing that the inspector had performed an interferent detection check, a radio frequency check, a diagnostic check, a mouth alcohol detection check, a calibration check, and a difference check, all addressed by the manual. "Rather than requiring exact compliance with GBI rules, [this Court has] upheld the admission of [breath] test results when the State has shown substantial compliance with the rules. Any deviation from such rule goes to the weight of the

---

[5] Although Stewart's expert witness identified this manual and testified as to its requirements, the evidence showed that he was a former deputy sheriff with the Broward County, Florida Sheriff's Department and had his Intoxilyzer certification from the State of Florida. There was no evidence that he had ever worked for the GBI.

evidence, rather than its admissibility." (Footnotes omitted.) *Jarriel v. State*, 255 Ga. App. 305, 308 (565 SE2d 521) (2002). See also *State v. Palmaka*, 266 Ga. App. 595, 597 (597 SE2d 630) (2004); *Scara v. State*, 259 Ga. App. at 513; *Berkow v. State*, 243 Ga. App. 698, 701 (534 SE2d 433) (2000).

Accordingly, we find that the Intoxilyzer evidence was properly admitted at trial and Stewart has failed to establish that he was deprived of due process based upon the introduction of this evidence.

*Judgment affirmed. Blackburn, P. J., and Mikell, J., concur.*

DECIDED JULY 10, 2006 — 

*Head, Thomas, Webb & Willis, William C. Head,* for appellant.

*Shawn E. LaGrua, Solicitor-General, Ellen G. Maurice, Assistant Solicitor-General,* for appellee.

