### A08A1245. LASETER v. THE STATE.
#### (668 SE2d 495)

MIKELL, Judge.

The state charged Joe T. Laseter with driving under the influence of alcohol to the extent that it was less safe for him to drive, driving with an alcohol concentration of 0.08 or more, and reckless driving. The trial court granted a directed verdict on the reckless driving charge. Laseter was found guilty by a jury of both remaining offenses, and the trial court merged the counts at sentencing. Laseter appealed to the Supreme Court, which transferred the appeal to this Court. On appeal, Laseter contends that the trial court erred in admitting evidence of the results of his horizontal gaze nystagmus (HGN) field sobriety test and of his Intoxilyzer 5000 breath test. For the reasons that follow, we affirm.

---

1. Laseter asserts that the arresting officer did not perform the HGN field sobriety test in accordance with the guidelines for performing the test, and therefore the trial court erred in admitting evidence of the results of the HGN test. We disagree.

On appellate review of a trial court's order on a motion to suppress evidence,

> the trial court's application of the law to the facts is subject to de novo review if the facts are stipulated, or if the critical facts do not depend on the testimony of witnesses who are subject to cross-examination. However, a trial court's ruling on a motion to suppress frequently involves a mixed question of fact and law. When the outcome of a motion to suppress depends on the credibility of the witnesses or on disputed facts, and the trial court has not committed an error of law, the court's ruling will not be disturbed on appeal. As a reviewing court, we must accept the factual and credibility determinations and inferences drawn by the trier of fact, even if we disagree with them, as long as there is evidence in the record to support the trial court's findings.[1]

"[C]onstru[ing] the evidence most favorably to the upholding of the trial court's findings and judgment,"[2] the record reflects that on February 23, 2005, about 2:10 a.m., Laseter stopped at a roadblock on Cumberland Boulevard near Akers Mill Road, where Officer Victor Verola, a P.O.S.T.-certified member of the Cobb County Police Department's DUI Task Force, was conducting license and safety checks. When Laseter showed Verola his driver's license, Verola noticed that Laseter had a "moderate" odor of alcohol about his person and that his eyes were bloodshot. In response to Verola's inquiry, Laseter admitted that he "had a few drinks earlier." Verola then asked Laseter to perform several field sobriety tests, including the HGN test,[3] walk and turn, and one-leg stand.[4] Verola explained that the HGN test involved asking the subject to follow a stimulus (such as a pen) with his eyes. Verola found all six clues on the HGN test and also noticed that Laseter swayed as he stood and had difficulty following the stimulus. Laseter tested positive on two

---

[1] (Citation omitted.) *Slayton v. State*, 281 Ga. App. 650-651 (1) (637 SE2d 67) (2006).

[2] (Footnote omitted.) *State v. Hester*, 268 Ga. App. 501, 502 (602 SE2d 271) (2004).

[3] The HGN test "is based upon the principle that horizontal gaze nystagmus, an involuntary movement of the eyes, can be caused by the ingestion of alcohol." (Citation omitted.) *Waits v. State*, 232 Ga. App. 357, 360 (3) (501 SE2d 870) (1998).

[4] Verola observed two clues out of a possible eight on the walk and turn and two clues on the one-leg stand test.

alco-sensor tests. Based on Verola's training and experience as a police officer, and based on his observation of Laseter, the odor of alcohol, the bloodshot eyes, Laseter's admission of drinking, his performance on the field sobriety tests, and the positive alco-sensor readings, Verola concluded that Laseter was a less safe driver due to alcohol consumption and placed him under arrest. Verola read Laseter the implied consent warning, and Laseter consented to the state-administered breath test. Verola conducted the breath test on an Intoxilyzer 5000. Of the two breath samples tested, the first registered 0.123 and the second 0.114.

Evidence based on a scientific principle or technique, such as evidence of an HGN test,[5] is admissible where the state shows that, first, "the general scientific principles and techniques involved are valid and capable of producing reliable results,"[6] and second, "the person performing the test substantially performed the scientific procedures in an acceptable manner."[7] Laseter acknowledges that the state has made the first required showing, which this Court has said to be "presumptively satisfied for the standardized HGN test":[8]

> [T]he HGN test is an accepted, common procedure that has reached a state of verifiable certainty in the scientific community. . . . Because HGN testing has reached this level of acceptance, a trial court may judicially notice, without receiving evidence, that the standardized HGN test has been established with verifiable certainty.[9]

Laseter contends, however, that the state failed to make the second required showing, and therefore that the trial court erred in failing to exclude the HGN test in its entirety.

In determining whether an officer performed an HGN test in an acceptable manner, the trial court may consider "whether the arresting officer was sufficiently trained to give the test, whether the officer was experienced in administering the test, whether the officer administered the test according to the standardized techniques, and whether the officer scored or interpreted the test properly."[10] In the case at bar, there was testimony to support the trial court's conclu-

---

[5] *Sultan v. State*, 289 Ga. App. 405, 407 (1) (657 SE2d 311) (2008) ("[e]vidence of a defendant's performance on an HGN test is considered to be evidence based on a scientific principle or technique").

[6] (Citations and punctuation omitted.) *State v. Tousley*, 271 Ga. App. 874, 876 (1) (a) (611 SE2d 139) (2005).

[7] (Citations and punctuation omitted.) Id.

[8] Id. at 878 (1) (b) (i).

[9] (Citations and punctuation omitted.) Id.

[10] (Citations omitted.) Id. at 879-880 (1) (b) (ii).

sion that Verola had sufficient experience and training to perform the HGN test, and that he substantially performed the test in an acceptable manner.

As to his experience and training, Verola testified that he had more than ten years experience as a police officer; that he had been a member of the DUI Task Force for more than a year before Laseter's arrest; and that he had undergone specialized training in DUI enforcement and standardized field sobriety evaluations, including the HGN test. Verola further testified that he had made as many as 500 stops for DUI during his tenure as a police officer, and that he had performed HGN evaluations approximately 300 times. In his testimony, Verola described the "qualification" or "equal tracking" portion of the HGN test;[11] as well as the three parts of the HGN test itself (smooth pursuit, nystagmus at maximum deviation, and onset prior to 45 degrees), and the proper method of scoring (a total of six clues, one for each eye for each part of the three parts of the test).

As to the performance of the HGN test in this case, Laseter argues that the videotape of the stop, which was introduced into evidence at the motion hearing and also played for the jury, shows that Verola's conduct of the test was flawed as to each of the three parts of the test. Testifying as an expert witness for Laseter at trial was a former Gwinnett County police officer, Mark Schroyer. Schroyer conceded that Verola had complied with the training manual as to the first part of the test, smooth pursuit, which accounts for two clues. Schroyer testified that the second part of the test, maximum deviation, was compromised because the videotape seemed to indicate that Verola had held the stimulus out for only two seconds, instead of the required four seconds. The record reflects, however, that because of the angle of the camera, it was not clear from the videotape exactly how long Verola held out the stimulus, whether two or four seconds, and the evidence is conflicting on this point. Laseter's expert further testified that the third part of the test, angle of onset, was compromised because Verola had made the pass with his pen in less than the required four seconds; however, Verola testified that according to his training, he did not have to take the entire four seconds, but he could stop when he recognized the tell-tale nystagmus indicating impairment. Thus, there was evidence to support the trial court's conclusion that "the officer substantially performed the HGN test in an acceptable manner";[12] it follows that

---

[11] See *Sultan*, supra at 408 (1) (where officer failed to qualify subject for HGN test, no portion of HGN test could be relied upon as evidence of impairment).

[12] (Citations omitted.) *Tousley*, supra at 880 (1) (b) (ii).

the trial court did not err in ruling the results of the HGN test admissible in evidence. The defense expert's testimony challenging the results of the HGN test in this case go to the weight and credibility to be given to this evidence, not to its admissibility.[13]

2. In his second enumeration of error, Laseter argues that the trial court should have suppressed the results of his Intoxilyzer 5000 breath test. First, Laseter argues that the Division of Forensic Sciences (DFS) of the Georgia Bureau of Investigation (GBI) has not complied with the mandate of OCGA § 40-6-392 (a) (1) (A) to provide "requirements for properly operating" the Intoxilyzer 5000. He further asserts that this failure allows for ad hoc actions in testing, in violation of his constitutional rights under the Georgia and United States Constitutions. Laseter also contends that the breath test results do not constitute "scientific evidence" and are therefore not admissible in evidence. We find no error.

This enumeration of error raises only issues of law. Therefore, our review of the trial court's denial of Laseter's motion to suppress the Intoxilyzer test results is de novo.[14]

OCGA § 40-6-392 (a) provides for the general admissibility of the results of chemical tests of bodily substances, including breath tests.[15] In order for such a test to be considered valid, however, it must comply with the following provision of OCGA § 40-6-392 (a) (1) (A):

> Chemical analysis of the person's blood, urine, breath, or other bodily substance, to be considered valid under this Code section, shall have been performed according to methods approved by the [DFS] of the [GBI] on a machine which was operated with all its electronic and operating components prescribed by its manufacturer properly attached and

---

[13] See id. at 881 (c). Accord *Keller v. State*, 271 Ga. App. 79, 80-81 (2) (608 SE2d 697) (2004).

[14] See *State v. Palmaka* ("*Palmaka I*"), 266 Ga. App. 595, 596 (597 SE2d 630) (2004). If the enumeration of error had challenged the manner in which the officer administered this particular test on this occasion, then we would be required to defer to the trial court's findings, because the trier of fact may "believe or disbelieve all or any part of the testimony of witnesses." (Citation and punctuation omitted.) *Beard v. State*, 242 Ga. App. 742, 743 (531 SE2d 168) (2000).

[15] OCGA § 40-6-392 (a):
Upon the trial of any civil or criminal action or proceeding arising out of acts alleged to have been committed by any person in violation of Code Section 40-6-391, evidence of the amount of alcohol or drug in a person's blood, urine, breath, or other bodily substance at the alleged time, as determined by a chemical analysis of the person's blood, urine, breath, or other bodily substance shall be admissible.
See *State v. Carter*, 292 Ga. App. 322, 323 (665 SE2d 14) (2008).

in good working order and by an individual possessing a valid permit issued by the [DFS] for this purpose.[16]

Here, the arresting officer testified that he conducted Laseter's breath test on an Intoxilyzer 5000 within an hour of the arrest, and that he had conducted other breath tests on that machine both before and after the test on Laseter's breath. Verola testified that he had completed a training course and had received a DFS permit to operate the Intoxilyzer 5000. A copy of Verola's permit was introduced into evidence, showing that it was in effect on February 23, 2005, when Laseter's breath was tested. Also introduced into evidence were certificates showing that the Intoxilyzer 5000 had been tested and found to be in good working order on February 4, 2005, and again on April 8, 2005; that is, both before and after the machine was used to test Laseter's breath on February 23, 2005. Verola further testified that the machine passed its own diagnostic test, appeared to be in good working order, and did not appear to have any parts missing at the time he used it to conduct the test at issue here. This evidence was sufficient to establish a foundation for the admission of the breath test results.[17]

(a) Laseter argues, however, that the test result is inadmissible because the DFS has not promulgated rules for the proper operation of the Intoxilyzer 5000 machine. Laseter points to the second sentence of OCGA § 40-6-392 (a) (1) (A), which provides in pertinent part:

> The [DFS] of the [GBI] shall approve satisfactory techniques or methods to ascertain the qualifications and competence of individuals to conduct analyses and to issue permits, along with requirements for properly operating and maintaining any testing instruments, and to issue certificates certifying that instruments have met those requirements.

In his appellate brief, Laseter correctly observes that, under prior decisions of this Court,[18] breath test results are admissible if the "methods approved" by the DFS have been met,[19] that is, if the test

---

[16] OCGA § 40-6-392 (a) (1) (A). See *Scara v. State*, 259 Ga. App. 510, 511 (1) (577 SE2d 796) (2003).

[17] *Stapleton v. State*, 279 Ga. App. 296, 298 (2) (630 SE2d 769) (2006).

[18] E.g., *Palmaka v. State* ("*Palmaka II*"), 280 Ga. App. 761, 763 (634 SE2d 883) (2006); *Stewart v. State*, 280 Ga. App. 366, 370 (3) (634 SE2d 141) (2006); *State v. Naik*, 259 Ga. App. 603, 605 (577 SE2d 812) (2003).

[19] OCGA § 40-6-392 (a) (1) (A); Ga. Comp. R. & Regs. r. 92-3-.06 (12) (a).

is conducted on an Intoxilyzer 5000;[20] the testing operator has a valid permit[21] and has attended a breath analysis certification course;[22] and the testing instrument has been tested periodically.[23] Laseter asserts, however, that the "methods approved" by the DFS are somehow separate and distinct from the "requirements for properly operating . . . any testing instruments" mentioned later in the Code section.[24]

If we were writing on a clean slate, we might well agree with Laseter that the statute requires the DFS to issue by regulation detailed instructions for administering the test, i.e., instructions in addition to those provided by the manufacturer and in addition to the methods taught orally at state-sponsored training courses. But this issue has already been decided adversely to the appellant. In *Rowell v. State*[25] we "rejected the claim that DFS regulations were defective because they did not contain specific procedures to be employed in the operation and calibration of Intoxilyzer 5000 machines."[26] In *Dougherty v. State*,[27] the defendant similarly argued that his breath test was inadmissible, because "the DFS rules and regulations . . . do not set forth the testing procedures"[28] and "should contain a more detailed description of the actual procedures used to operate and maintain the Intoxilyzer 5000."[29] In *Dougherty*, in light of the fact that there, as here, the defendant presented no evidence that additional rules were necessary to ensure fair and accurate testing, we held that the techniques and methods approved by the DFS, whatever they are, were sufficient under OCGA § 40-6-392 (a) (1) (A).[30] We conclude that *Dougherty* is apposite and controlling under the facts of this case.

(b) In a related argument, Laseter contends that the alleged lack of "requirements for properly operating" the Intoxilyzer 5000 renders the testing system provided in OCGA § 40-6-392 (a) (1) (A) unconstitutionally vague and violates basic due process rights. This argument was rejected by this Court in *Palmaka II*,[31] and we are not persuaded by Laseter's arguments that that case was wrongly

---

[20] See Ga. Comp. R. & Regs. r. 92-3-.06 (12) (a) (1).

[21] See Ga. Comp. R. & Regs. r. 92-3-.06 (12) (a) (2).

[22] See Ga. Comp. R. & Regs. r. 92-3-.02 (2) (e), r. 92-3-.06 (8) (b).

[23] See Ga. Comp. R. & Regs. r. 92-3-.06 (12) (a) (3).

[24] OCGA § 40-6-392 (a) (1) (A).

[25] 229 Ga. App. 397-398 (1) (a) (494 SE2d 5) (1997).

[26] *Carter*, supra at 327, citing *Rowell*, supra.

[27] 259 Ga. App. 618 (578 SE2d 256) (2003).

[28] Id. at 621 (1) (c).

[29] Id.

[30] Id. See also *Palmaka II*, supra at 764.

[31] Supra at 763.

decided. Laseter's reliance on *Botts v. State*[32] is misguided. In *Botts*, as we explained in *Palmaka II*, "the Supreme Court held that OCGA § 17-10-17, the statute which permitted enhanced punishment for hate crimes, was unconstitutionally vague because it failed to provide fair warning of the proscribed conduct, in violation of the due process clauses of the federal and state constitutions."[33] We concluded that *Botts* was inapposite to the situation presented in *Palmaka II*.[34] Laseter argues that we failed to advert to the second rationale of *Botts*: that the statute there in question "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory applications."[35] The statute under consideration in *Botts*, however, is not analogous to the rules and regulations under consideration here, which provide for chemical analysis of breath samples.[36] Further, as we noted in *Palmaka II*, "OCGA § 40-6-392 (a) (1) (A) provides only for the admissibility of the test results. A defendant remains free to challenge the weight and credibility of that evidence before the jury."[37]

(c) Laseter contends that the results of his breath test do not constitute "scientific evidence" and are therefore inadmissible. Laseter acknowledges that, under *Lattarulo v. State*,[38] Intoxilyzer test results were held to meet the standard for admissibility as scientifically reliable evidence.[39] However, Laseter attempts to distinguish *Lattarulo* on the ground that it was decided before Ga. Comp. R. & Regs. r. 92-3-.06 (12) (b)[40] was promulgated in 2000.[41] This argument is without merit. We have consistently held, both before and after the adoption of Ga. Comp. R. & Regs. r. 92-3-.06 (12) (b), that the results of Intoxilyzer breath tests comply with the standard for admissibility as scientifically reliable evidence.[42] And as the Supreme Court observed in *Lattarulo*, "no procedure is infallible. An accused may always introduce evidence of the possibility of error

---

[32] 278 Ga. 538 (604 SE2d 512) (2004).

[33] (Footnote omitted.) *Palmaka II*, supra, citing *Botts*, supra at 539-540.

[34] *Palmaka II*, supra.

[35] (Citation and punctuation omitted; emphasis in original.) *Botts*, supra at 540.

[36] *Palmaka II*, supra.

[37] (Punctuation and footnote omitted.) Id. at 764, citing *Dougherty*, supra.

[38] 261 Ga. 124 (401 SE2d 516) (1991).

[39] Id. at 127 (3) (dealing with the Intoximeter 3000).

[40] Ga. Comp. R. & Regs. r. 92-3-.06 (12) (b) ("Administrative, procedural, and/or clerical steps performed in conducting a test shall not constitute a part of the approved method of analysis").

[41] See *Palmaka I*, supra at 597 ("the GBI promulgated in 2000 the [R]ule now codified in Ga. Comp. R. & Regs. r. 92-3-.06 (12) (b)").

[42] See *Stewart*, supra at 367 (1).

or circumstances that might have caused the machine to malfunction. Such evidence would relate to the weight rather than the admissibility of breathalyzer results."[43]

The trial court did not err in denying Laseter's motion to suppress the results of his breath test. Accordingly, his conviction is affirmed.

*Judgment affirmed. Smith, P. J., and Adams, J., concur.*

DECIDED OCTOBER 9, 2008.

*Charles T. Magarahan*, for appellant.

*Barry E. Morgan, Solicitor-General, Jimmy L. Newkirk, Assistant Solicitor-General*, for appellee.

---

[43] *Lattarulo*, supra at 126 (3).