**THIRD DIVISION
MERCIER, C. J.,
DOYLE, P. J. and GOBEIL, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**August 16, 2023**

# In the Court of Appeals of Georgia

A23A0768. LUNA-GALACIA v. THE STATE.

DOYLE, Presiding Judge.

A jury found Juan Luna-Galacia guilty of driving under the influence of alcohol and without a valid license. Following the denial of his motion for new trial, Luna-Galacia appealed to this Court, arguing among other things that the trial court erred by admitting the results of his State-administered breath test because his consent to the test was not voluntary. We remanded the case for the trial court to reconsider its ruling in light of the Supreme Court of Georgia's decision in *Elliott v. State*, 305 Ga. 179 (824 SE2d 265) (2019), that a DUI suspect's refusal to submit to a State-administered breath test is not admissible against him. See *Luna-Galacia v. State*, 349 Ga. App. XXIV (Case No. A18A2040, Mar. 4, 2019) (unpublished) ("*Luna-Galacia I*"). The trial court subsequently ruled that Luna-Galacia's breath test

was admissible under the totality of the circumstances, and he appeals again. For reasons that follow, we affirm.

We begin with the pertinent facts set forth in our prior opinion, which we will supplement as needed to address the issues in this appeal:

> [O]n July 17, 2016, at approximately 2:15 a.m., a police officer pulled over a truck that was failing to maintain its lane. The officer smelled a strong odor of alcohol coming from inside the vehicle, and he observed that the passenger had a beer in his lap. After the officer asked for identification, the driver — Luna-Galacia — gave him a New Mexico drivers license, and the officer asked him to exit the vehicle. Luna-Galacia's eyes were watery and bloodshot, and the officer smelled alcohol on his breath. Luna-Galacia explained that he was driving his brother home but could not tell the officer the address. Luna-Galacia then offered to let the officer search the vehicle; the officer declined. When asked how many beers he had that night, Luna-Galacia initially stated that he had consumed 3 approximately "30 minutes to 40 minutes ago." He then changed it to "three to four" before ultimately admitting he had six beers that night. The officer administered field sobriety tests to Luna-Galacia, who exhibited six out of six "clues" indicating impairment on the [horizontal gaze nystagmus, or "HGN"] test, four out of eight clues on the "walk and turn test," and three out of four clues on the "one-leg stand test."

> Concluding that Luna-Galacia was impaired, the officer placed him under arrest, read him verbatim the statutorily mandated implied

2

consent, and asked if he would submit to a breath test. Luna-Galacia agreed, but asked if his license would be suspended. The officer told him he was not suspending his license, but asked again if Luna-Galacia would consent to the breath test, and he replied "Yes, I understand." The officer then transported him to jail, where he administered the Intoxilyzer 9000 breath test on Luna-Galacia, which test showed a [blood alcohol concentration, or "BAC"] of 0.169 and 0.153 [in two separate readings five minutes apart].

*Luna-Galacia I*, slip op. at 2-4 (footnote omitted).

Luna-Galacia was charged with driving under the influence of alcohol with an unlawful alcohol concentration ("DUI per se"), driving under the influence of alcohol to the extent it was less safe for him to drive ("DUI less safe"), driving with a suspended license, and failure to maintain his lane. Before trial, he moved in limine to exclude the results of his breath test, arguing — as relevant here — that his consent was invalid because the implied consent notice gave legally inaccurate information and that the Intoxilyzer 9000 was not proven to be scientifically reliable. The trial court denied the motion.

The case proceeded to a jury trial, where Luna-Galacia was found guilty of DUI per se, DUI less safe, and driving without a valid license.[1] The trial court merged

---

[1] The jury found him not guilty of failure to maintain lane.

the two DUI convictions and sentenced Luna-Galacia to a total of twenty-four months, to serve ten days in confinement and the remainder on probation. Luna-Galacia filed a motion for new trial, arguing among other things that he did not actually consent to the breath test. The trial court denied the motion, ruling that Luna-Galacia did consent because "there was no evidence that [the officer] used fear, intimidation, threat of physical punishment, or lengthy detention to obtain consent." Luna-Galacia appealed, arguing that the implied consent notice was misleading and that his consent to the breath test was not voluntary. He also raised three other issues — that the court should not have permitted the arresting officer to correlate his field sobriety test results to specific blood alcohol levels, that the jury should have been charged on the issue of the voluntariness of his breath test, and that the Intoxilyzer 9000 is not sufficiently reliable.

Addressing Luna-Galacia's argument that "he was coerced into submitting to a breath test because the language of the implied consent notice stated that a refusal to submit to testing was admissible against him," we noted that the trial court had rejected this argument "without the benefit of the Supreme Court's recent ruling in *Elliott*[.]" *Luna-Galacia I*, slip op. at 5-6 (1). In particular, we highlighted the Supreme Court's acknowledgment in *Elliott* that its holding "'may affect a

4

totality-of-the-circumstances inquiry into whether a defendant voluntarily submitted to a breath test where the State first threatened that, if [he] refused, that would be evidence against [him] at trial.'" Slip op. at 6 (1), quoting *Elliott*, 305 Ga. at 223 (IV) (E). Accordingly, we remanded the case for the trial court to "reconsider its ruling on Luna-Galacia's motion for new trial in light of [the Supreme Court's *Elliott* holding]." *Luna-Galacia I*, slip op. at 6 (1). We did not address Luna-Galacia's other enumerations of error. Id. at 6 (2).

Following remand, the trial court entered a second order again denying Luna-Galacia's motion for new trial. The court concluded that

> [t]here was no evidence presented, nor any other indication, that the possibility that evidence of a refusal could be used against [Luna-Galacia] factored into [his] decision to provide a breath sample. The only evidence before this Court indicates that the encounter between [the officer] and [Luna-Galacia] was cordial and free of intimidation and coercion; that [Luna-Galacia] understood the encounter, the nature of the Implied Consent Warning, and the reason for the request for a breath sample; and that [his] primary concern was the status of his license.

(Footnote omitted.) The court further found that Luna-Galacia "understood the implied consent advisement and consented to the test, despite having an interpreter

5

assist him at trial." Luna-Galacia appeals for a second time, challenging this new ruling and also reiterating the enumerations of error that we declined to address in his first appeal.

1. Luna-Galacia argues that his consent to the breath test "was not actual and voluntary" because his English language skills were deficient, the implied consent notice he was given was legally incorrect and misleading, he did not knowingly and intelligently waive his rights, and the State did not rebut the presumption of coercion arising from custodial interrogation.[2] Accordingly, Luna-Galacia contends that the trial court erred by admitting the test results. We disagree.

We begin with the applicable law. In *Olevik v. State*, 302 Ga. 228 (806 SE2d 505) (2017), our Supreme Court held that the Georgia constitution's protection against compelled self-incrimination prevents the State from forcing drivers to submit to chemical testing of their breath. Id. at 246 (2) (c) (iv). In determining whether a DUI suspect voluntarily consented to a breath test, or whether the test was compelled, trial courts must consider the totality of the circumstances, including

---

[2] "For convenience of discussion, we have taken the enumerated errors out of the order in which [Luna-Galacia] has listed them." *Foster v. Morrison*, 177 Ga. App. 250, 250 (1) (339 SE2d 307) (1985).

such factors as the age of the accused, his education, his intelligence, the length of detention, whether the accused was advised of his constitutional rights, the prolonged nature of questioning, the use of physical punishment, and the psychological impact of all these factors on the accused. In determining voluntariness, no single factor is controlling.

Id. at 251 (3) (b) (citation and punctuation omitted).

In *Elliott*, decided 16 months later, the Supreme Court held that the state constitutional protection against compelled self-incrimination precludes the admission of evidence that a driver refused a breath test in a criminal prosecution of the driver. 305 Ga. at 179-180. As we noted in *Luna-Galacia I*, the *Elliott* Court "recognize[d]" that its holding "may affect a totality-of-the-circumstances inquiry into whether a defendant voluntarily submitted to a breath test where the State first threatened that, if [he] refused, that would be evidence against [him] at trial." Id. at 223 (IV) (E). The Court did not elaborate on how its ruling might affect the totality-of-the-circumstances inquiry, finding that question was "not presently before [it]." Id. In the wake of *Elliott*, this Court has held that "the appropriate inquiry remains whether the defendant's consent to the [breath] test was voluntary under the totality of the circumstances." *State v. Henderson*, 356 Ga. App. 473, 476 (847 SE2d 833)

7

(2020). See also *Kallon v. State*, 355 Ga. App. 546, 550 (2) (845 SE2d 348) (2020) (remanding for the trial court to consider the voluntariness of the defendant's consent to a breath test under the totality of the circumstances in light of *Elliott*); *Fofanah v. State*, 351 Ga. App. 632, 636 (2) (b) (832 SE2d 449) (2019) (same).

> In reviewing a trial court's decision on a motion to exclude evidence,
>
> this Court must construe the evidentiary record in the light most favorable to the trial court's factual findings and judgment. In so doing, we must focus on the facts found by the trial court in its order, as the trial court sits as the trier of fact; however, we may consider facts that definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility, such as facts indisputably discernible from a videotape. . . . Finally, although we defer to the trial court's factfinding, we owe no deference to the trial court's legal conclusions. Instead, we independently apply the law to the facts as found by the trial court.

*State v. Ortiz*, 363 Ga. App. 829, 829 (873 SE2d 217) (2022) (citations, punctuation, and emphasis omitted).

(a) Turning to Luna-Galacia's arguments, he first contends that his DUI convictions should be set aside under *State v. Ortiz*, 363 Ga. App. 829, because his English comprehension was insufficient. In *Ortiz*, a Spanish-speaking DUI suspect indicated multiple times that he did not understand the English-speaking officers'

8

requests that he submit to a breath test, and the trial court suppressed the test results on the ground that the suspect "lacked the capacity to give actual consent for the tests based on a language barrier." Id. at 829, 831-832. We affirmed, noting that under our deferential standard of review, we will not reverse the trial court's ruling "in the absence of evidence of record *demanding* a finding contrary to the judge's determination." Id. at 836 (1) (citation and punctuation omitted; emphasis in original).

This case is quite different from *Ortiz*. While the arresting officer documented that Luna-Galacia spoke "partial English," the officer also testified that he asked Luna-Galacia "a lot of questions . . . to make sure he understood," that Luna-Galacia repeatedly affirmed that he did understand, and that the officer knew Luna-Galacia understood because he tried to follow the officer's instructions to the best of his ability. Moreover, the video of the encounter shows that early on, the officer asked Luna-Galacia, "You speak English pretty well?" and Luna-Galacia responded, "Yeah, I understand." The video also shows that Luna-Galacia readily spoke with the officer in English about his prior activities that evening and his intended plans. Thus, although Luna-Galacia requested and received the services of an interpreter at trial, we cannot say that the trial court erred by concluding that language did not present a barrier to Luna-Galacia's understanding of the officer's request for a breath test.

9

(b) Luna-Galacia contends that the implied consent notice was misleading. The officer testified that he read the following words to Luna-Galacia from a preprinted card:

> Georgia law requires you to submit to state administered chemical tests of your blood, breath, urine, or other bodily substances for the purpose of determining if you are under the influence of alcohol or drugs.
>
> If you refuse this testing, your Georgia driver's license or privilege to drive on the highways of this state will be suspended for a minimum period of one year. Your refusal to submit to the required testing may be offered into evidence against you at trial.
>
> If you submit to testing and the results indicate an alcohol concentration of 0.08 grams or more, your Georgia driver's license or privilege to drive on the highways of this state may be suspended for a minimum period of one year.
>
> After first submitting to the required state tests, you are entitled to additional chemical tests of your blood, breath, urine or other bodily substances at your own expense and from qualified personnel of your own choosing.
>
> Will you submit to the state administered chemical tests of your [breath] under the implied consent law?[3]

---

[3] This language is found in former OCGA § 40-5-67.1 (b) (2) (2012).

10

In light of the Supreme Court's rulings in *Olevik* and *Elliott*, "[t]here is no dispute that [this] notice improperly advised [Luna-Galacia] that he was required to submit to a breath test and that his refusal to consent to a breath test could be used against him at trial." *Blazek v. State*, 364 Ga. App. 128, 131 (874 SE2d 165) (2022).

But the inclusion of misleading information in the implied consent notice does not render the notice unconstitutionally coercive on its face. *Kallon*, 355 Ga. App. at 549 (1). Thus, although the reading of an inaccurate implied consent notice may be one factor relevant in determining the voluntariness of consent to a breath test, "the trial court must also consider factors such as a defendant's age, education, capacity, the nature of questioning, and any threats employed." *Blazek*, 364 Ga. App. at 132 (citation and punctuation omitted). Here, the court found that "[t]here was no evidence presented, nor any other indication, that the possibility that evidence of a refusal could be used against [Luna-Galacia] factored into [his] decision to provide a breath sample." Luna-Galacia has shown no error in this finding. The trial court also found that the encounter between the officer and Luna-Galacia was cordial and non-coercive, and the video of the incident supports that determination.

(c) Luna-Galacia argues that he "made no knowing and intelligent waiver of his rights under the Georgia constitution." He cites *State v. Fulghum*, 261 Ga. App.

11

594 (583 SE2d 278) (2003), in which we affirmed a trial court's suppression of evidence obtained in a warrantless search of a residence because (i) the officer did not expressly ask for consent to search and the defendant's wife did not give it, and (ii) the officer misrepresented to the defendant's wife that he had the authority to search, with or without consent. Id. at 595-596 (1)-(2). Assuming *Fulghum*'s Fourth Amendment analysis applies in this context, that case is distinguishable on its facts. Unlike the defendant in *Fulghum*, Luna-Galacia was explicitly asked for — and explicitly gave — his consent, and the officer did not suggest that such consent was a mere formality. Luna-Galacia has shown no error in the trial court's ruling that his consent was given voluntarily, without "intimidation or coercion."

(d) Finally, Luna-Galacia asserts that "the state did not rebut the presumption of coercion that arises from custodial interrogation" because the officer did not give him a *Miranda* warning before reading the implied consent notice. Luna-Galacia acknowledges that such warnings are not legally required, see *State v. Turnquest*, 305 Ga. 758, 774-775 (4) (827 SE2d 865) (2019), but he urges that the absence of warnings creates a presumption of coercion. Again, however, the trial court found that the encounter between Luna-Galacia and the arresting officer was "cordial and

12

free of intimidation and coercion," and Luna-Galacia has not shown that this finding was erroneous.

In sum, because Luna-Galacia points to no "evidence of record *demanding* a finding contrary to the judge's determination" that his consent was voluntary, *Ortiz*, 363 Ga. App. at 836 (1), we have no basis for disturbing the trial court's ruling.

2. Luna-Galacia contends that the trial court erred by allowing the prosecutor to "correlate HGN clues with specific levels of blood alcohol." We find no reversible error.

At trial, the arresting officer testified that showing four out of six clues on the HGN test "is indicative of impairment, and a BAC of .08[.]" The officer also said that Luna-Galacia showed six out of six clues, which generally indicates a BAC of 0.1 or greater. Defense counsel objected to this testimony, but the trial court overruled the objection. At the time of trial, this testimony was admissible under *Spencer v. State*, 337 Ga. App. 360, 360-361 (1) (787 SE2d 320) (2016) (trial court did not err by allowing testimony that "generally, four out of six clues on the HGN [test] shows that a blood-alcohol content exceeds the impairing level of 0.08."). Four months later, however, the Supreme Court reversed our decision in *Spencer*, ruling that the State could not present evidence of "[a] correlation between a particular number of clues

13

on an HGN test and a numeric blood alcohol content" in the absence of a sufficient showing of scientific validity or reliability. *Spencer v. State*, 302 Ga. 133, 137-139 (805 SE2d 886) (2017).

The State concedes that, in light of the Supreme Court's ruling in *Spencer*, the admission of the officer's correlation testimony in this case was error, but the State contends that the error was harmless. We agree. The officer testified that Luna-Galacia admitted to drinking alcohol, had a positive alco-sensor result, demonstrated multiple clues on all three field sobriety tests, and gave breath samples showing a BAC of 0.169 and 0.153. In light of this overwhelming evidence, "it is highly probable that [the correlation evidence] did not contribute to the jury's verdict of guilty as to DUI per se." *Jones v. State*, 301 Ga. 544, 551 (3) (802 SE2d 234) (2017). While it is a "closer call" as to whether the correlation evidence contributed to Luna-Galacia's DUI less safe conviction, see id., the trial court merged that conviction into the DUI per se conviction. "In light of the merger, the DUI less safe count is void, and any error as to that count was harmless." *Greene v. State*, 312 Ga. App. 666, 671 (2) (722 SE2d 77) (2011). See also *Jones*, 301 Ga. at 544, n. 1, 551 (3) (any error related to DUI less safe conviction was moot because that charge "merged for sentencing purposes" with DUI per se conviction).

3. Before trial, Luna-Galacia requested seven jury charges concerning the admissibility, voluntariness, and credibility of a defendant's custodial "statements." The trial court did not give these charges, and defense counsel objected. Luna-Galacia contends that the court erred by failing to give the charges, but we do not agree. "A requested charge must be legal, apt, and *precisely* adjusted to some principle involved in the case and be authorized by the evidence. If any portion of the request to charge fails in these requirements, denial of the request is proper." *Bravo v. State*, 249 Ga. App. 433, 435 (2) (548 SE2d 129) (2001) (citation and punctuation omitted; emphasis in original). The charges at issue here concerned the voluntariness of a defendant's *confession* or other substantive statements, not his consent to a State-administered breath test. Because the charges were not precisely adjusted to the case, the trial court was not required to give them. This claim of error therefore lacks merit.

4. Before trial, Luna-Galacia filed a motion in limine to exclude the results of his breath test, arguing that the Intoxilyzer 9000 used by the arresting officer did not meet the standard for scientific reliability set forth in *Harper v. State*, 249 Ga. 519 (292 SE2d 389) (1982). In particular, Luna-Galacia claimed that due to software updates, the device in question was "not the device originally approved by the [Georgia Bureau of Investigation] for evidentiary breath testing purposes" and that

15

the machine "was improperly calibrated and not in proper working condition." The trial court denied the motion, ruling that breathalyzer tests have long been considered scientifically reliable. Luna-Galacia argues that this ruling was error because the court considered the reliability only of the device's hardware, not its software, and confused the device with a different breathalyzer machine. We review the trial court's ruling for abuse of discretion, see *Lewis v. State*, 306 Ga. 455, 461 (2) (a) (831 SE2d 771) (2019), and we find none here.

In *Harper*, the Supreme Court held that "[o]nce a [scientific] procedure has been recognized in a substantial number of courts, a trial judge may judicially notice, without receiving evidence, that the procedure has been established with verifiable certainty, or that it rests upon the laws of nature." 249 Ga. at 526 (1). In 1991, the Supreme Court applied the principles of *Harper* to the Intoximeter 3000 and held that "the results of breathalyzer tests are clearly admissible. The breathalyzer is hardly 'novel' scientific evidence. Its acceptance is almost as widespread as radar or fingerprints." *Lattarulo v. State*, 261 Ga. 124, 126 (3) (401 SE2d 516) (1991). The Court noted that the Intoximeter 3000 was used in at least nine other states and one foreign country and that "[i]ts characteristics, theory, operation, and scientific acceptability have been discussed in numerous judicial opinions." Id. Nevertheless,

16

because "no procedure is infallible[,]" "[a]n accused may always introduce evidence of the possibility of error or circumstances that might have caused the machine to malfunction. Such evidence would relate to the weight rather than the admissibility of breathalyzer results." Id.

After *Lattarulo*, this Court held that results from the Intoxilyzer 5000, an updated breathalyzer, were admissible under the standard of *Harper* and its progeny. *Stewart v. State*, 280 Ga. App. 366, 367 (1) (634 SE2d 141) (2006). Such results are admissible so long as the test was

> performed according to methods approved by . . . the GBI on a machine which was operated with all its electronic and operating components prescribed by its manufacturer properly attached and in good working order and by an individual possessing a valid permit . . . for this purpose.

*Laseter v. State*, 294 Ga. App. 12, 16-17 (2) (668 SE2d 495) (2008) (citation and punctuation omitted).

In this case, the arresting officer used an Intoxilyzer 9000, an updated version of the Intoxilyzer 5000, to test Luna-Galacia's breath. The officer testified that he had a permit to use the device, that it appeared to be in good working order with all of its components, and that its diagnostic self-checks revealed no problems when Luna-Galacia's breath was tested. Copies of inspection certificates dated approximately six

weeks before and six weeks after Luna-Galacia's breath test were admitted at trial showing that the device was then functioning properly. Under these circumstances, the admission of the test results was not error. See *Laseter*, 294 Ga. App. at 16-17 (2). Luna-Galacia's arguments concerning the software update and the officer's administration of the test went to the evidence's weight, not its admissibility. See *Lattarulo*, 261 Ga. at 126 (3).[4]

*Judgment affirmed. Mercier, C. J. concurs. Gobeil, J., concurs fully and specially.*

---

[4] In fact, defense counsel cross-examined the officer at length on these topics and argued to the jury that there was insufficient evidence of the device's reliability.

A23A0768.  LUNA-GALACIA v. THE STATE.


GOBEIL, Judge, concurring fully and specially.

In light of the Supreme Court of Georgia's recent jurisprudence on this topic and the deference to the trial court's factual findings, I concur fully to the Majority. But, I write separately to encourage the Supreme Court to provide clarity for law enforcement officers, lawyers, and the public alike regarding the impact of what is now a significantly inaccurate implied consent notice.

Here, you have a law enforcement officer (following the implied consent procedures dictated by the State) essentially telling a suspect — under arrest and in his custody — "Georgia law says you must do this." And, "if you don't, it may be used against you." Yet, the Supreme Court of Georgia has held the opposite: "Well actually, you don't have to do this" (*Olevik*) and "if you don't, the fact that you didn't can't be used against you" (*Elliott*). In other words, as interpreted by our Supreme Court, the implied consent notice at issue is plain wrong – and on what may be the two most salient points: "Do I have to [submit to the test]?" and "What if I don't?"

In *Olevik*, the Supreme Court acknowledged these significant inaccuracies. Yet, in analyzing the constitutionality of the implied consent statute (and the high bar for finding a statute unconstitutional), it held that the implied consent notice is not "so misleading and inaccurate that no person can validly consent to a state-administered test once the notice has been read." 302 Ga. at 247 (3) (a). And, it held that the implied consent notice "is not per se coercive on its face." Id. at 247-250 (3) (a) (i). Instead, it held that courts still must look to the totality of circumstances to determine if consent to a breath test was provided voluntarily. Id. at 251 (3) (b). Here, the trial court did so, and under the facts of this case, I concur to this court's affirmance of that decision. But, I still question how such a significant

2

divergence (between what is communicated to the suspect and what the law actually requires on two critical portions of the notice) should not weigh heavily against finding voluntary consent in many — if not most — scenarios.