A08A0761. THE STATE v. CARTER.

(665 SE2d 14)

PHIPPS, Judge.

Russell Carter was charged with driving under the influence of alcohol and failure to maintain lane. Evidence to be used at trial included the results of a breath test administered to Carter on an

Intoxilyzer 5000 instrument; in performing the test, Carter provided two sequential breath samples that registered blood-alcohol concentrations of 0.255 and 0.256. Before trial, Carter filed a written motion in limine stating on information and belief that, in violation of OCGA § 40-6-392, the breath testing device may not have had all of its electronic and operating components prescribed by the manufacturer attached and in good working order. Evidence introduced at the hearing on Carter's motion in limine showed that certificates of inspection had been issued certifying that the Intoxilyzer 5000 used to test Carter's breath had all of its prescribed electronic and operating components attached and in good working order at the time in question. Carter, nonetheless, argues that the device should not have been certified, because the testing of it during the inspection itself showed that it did not pass all operational requirements imposed by rules of the Division of Forensic Sciences (DFS) of the Georgia Bureau of Investigation (GBI). Finding merit in Carter's argument, the superior court granted his motion to suppress. The state appeals. For reasons that follow, we reverse.

### Statutory Scheme

OCGA § 40-6-392 (a) in effect provides for the general admissibility of evidence of the amount of alcohol or drug in a person's blood, urine, breath, or other bodily substance as determined by chemical analysis thereof; however, to be considered valid, the results of such chemical analysis must comply with the provisions of OCGA § 40-6-392 (a) (1) (A).[1]

The admissibility of breathalyzer test results is controlled solely by OCGA § 40-6-392.[2]

"Under OCGA § 40-6-392 (a) (1) (A), any chemical analysis, including breath tests, must be 'performed according to methods approved by the [DFS] of the [GBI].' "[3] This Code section further provides that for the state-administered test to be considered valid, it must be conducted "on a machine which was operated with all its electronic and operating components prescribed by its manufacturer properly attached and in good working order and by an individual possessing a valid permit issued by the [DFS] for this purpose."[4] OCGA § 40-6-392 (a) (1) (A) also requires the GBI to

---

[1] *State v. Kampplain*, 223 Ga. App. 16, 17 (477 SE2d 143) (1996).

[2] *Brannan v. State*, 261 Ga. 128, 129 (401 SE2d 269) (1991).

[3] *Jarriel v. State*, 255 Ga. App. 305, 307 (3) (565 SE2d 521) (2002).

[4] See *State v. Hunter*, 221 Ga. App. 837, 838 (1) (473 SE2d 192) (1996).

approve satisfactory techniques or methods to ascertain the qualifications and competence of individuals to conduct analyses and to issue permits, along with requirements for properly operating and maintaining any testing instruments, and to issue certificates certifying that instruments have met those requirements. . . .

OCGA § 40-6-392 (f) provides that

[e]ach time an approved breath-testing instrument is inspected, the inspector shall prepare a certificate which shall be signed under oath by the inspector and which shall include . . . language [stating that the] "breath-testing instrument . . . was thoroughly inspected, tested, and standardized by the [inspector] and all of its electronic and operating components prescribed by its manufacturer are properly attached and are in good working order." When properly prepared and executed, as prescribed in this subsection, the certificate shall, notwithstanding any other provision of law, be self-authenticating, shall be admissible in any court of law, and shall satisfy the pertinent requirements of paragraph (1) of subsection (a) of this Code section. . . .[5]

### GBI Rules

In Ga. Comp. R. & Regs. r. 92-3-.06, the DFS of the GBI established methods for administering breath tests and for issuing certificates certifying that testing instruments have met the requirement that the instruments' electronic and operating components are properly attached and in good working order.[6] In this regard, Rule 92-3-.06 (12) (a) provides that

[t]he methods approved by the [DFS] for conducting an evidential breath alcohol analysis shall consist of the following: (1) [t]he analysis shall be conducted on an Intoxilyzer Model 5000 manufactured by CMI, Inc., except as otherwise provided in Rule 92-3-.06 (5); (2) the analysis shall be performed by an individual holding a valid permit, in accordance with Rule 92-3-.02 (2); and (3) the testing

---

[5] See *Kampplain*, supra; *Brandon v. State*, 236 Ga. App. 203, 204 (1) (511 SE2d 573) (1999).

[6] See *State v. Palmaka*, 266 Ga. App. 595, 596 (597 SE2d 630) (2004).

instrument shall have been checked periodically for calibration . . . , in accordance with Rule 92-3-.06 (8) (a).[7]

Rule 92-3-.06 (12) (b) further provides that "[a]dministrative, procedural, and/or clerical steps performed in conducting a test shall not constitute a part of the approved method of analysis."

At the hearing below, Carter introduced an "implied consent operations manual," prepared by the DFS of the GBI and containing an "instrument inspection protocol." The operations manual requires the implied consent area supervisor to conduct inspections at least once each calendar quarter on each breath testing instrument used for evidential breath alcohol tests. Part of the inspection involves an "internal instrument evaluation." The manual generally provides that "[i]nstruments that fail to pass all operational requirements will be taken out of service."

One of the steps in the internal instrument evaluation is a "difference check," the purpose of which is to test the instrument's ability to correctly identify and indicate sample results that differ by more than 0.02 grams. The manual directs the inspector to perform the difference check by first preparing a wet simulator "with approximately 500 ml of a solution certified to produce an ethyl alcohol concentration of 0.08[,]" and by then connecting the simulator to the Intoxilyzer 5000's breath line and blowing through the simulator. The manual states that the instrument "should" then display a reading between 0.076 and 0.084. The supervisor must then blow his or her breath directly into the breath line, after which the display should read 0.000. The manual provides that "[t]he printout card must indicate the SAMPLE DIFFERENCE OUTSIDE REQUIRED PARAMETER, WAIT 20 MINUTES AND RETEST to pass the evaluation criteria for this test."[8] The manual directs the inspector to move on to the next step only if the instrument meets this requirement.

As the next step in the instrument evaluation following the difference check, the manual directs the inspector of the Intoxilyzer to perform a calibration check. As in the difference check, the calibration check is performed with use of two samples of an alcohol wet solution of known concentration certified by the manufacturer to produce 0.08 grams. The purpose of the calibration check is to ensure that the difference in sequential results of the samples with the same alcohol concentration not exceed five percent of the expected value or 0.004 grams. The instrument results must fall within those parameters to pass the calibration check.

---

[7] See *Rowell v. State*, 229 Ga. App. 397, 398 (1) (a) (494 SE2d 5) (1997).

[8] (Capitalization in original.)

## *Facts of this Case*

Carter was charged with driving under the influence of alcohol on July 29, 2005. Evidence introduced at the hearing on Carter's motion in limine showed that City of Dallas Police Officer Michael Hester had encountered Carter on that day and administered an Intoxilyzer 5000 breath test to him. Carter registered 0.255 and 0.256 blood alcohol concentrations on the test. Hester testified that he was certified by the GBI to operate the Intoxilyzer; that he had conducted tests with the device in question before and after testing Carter; that the instrument appeared to be functioning properly and in good working order when he tested Carter; that it did not appear to have any components missing; and that, during the administration of Carter's test, the instrument's self-diagnostic tests did not reflect any problems.

At the hearing, the state submitted certificates of inspection by the GBI showing that the breath testing instrument used in this case "was thoroughly inspected, tested, and standardized" by the inspector on June 27, 2005, and again on September 26, 2005, and that at both times "all of its electronic and operating components prescribed by its manufacturer [were] properly attached and [were] in good working order."

Carter submitted the printout card generated when the difference check was performed on the Intoxilyzer 5000 instrument during the quarterly inspection on June 27, 2005; the printout showed that the device displayed readings of 0.074 and 0.00 during the difference check. Consistent with that result, the Intoxilyzer produced a reading stating that the results were "outside required parameters" and directing the tester to wait 20 minutes and retest. In accordance with the requirements of the operation manual, the inspector proceeded to the next step, the calibration check. In that step, the Intoxilyzer registered 0.076 and 0.077, thereby passing the requirement that the difference in sequential results of samples with the same alcohol concentration not exceed 0.004 grams.

Upon completing the inspection, the inspector issued a certificate of inspection stating that the breath-testing instrument "was thoroughly inspected, tested, and standardized by [the inspector] and all of its electronic and operating components prescribed by its manufacturer are properly attached and in good working order."

The trial court, nonetheless, granted Carter's motion in limine on the ground that the Intoxilyzer 5000 machine failed to pass all of the operational requirements because it did not display a reading between 0.076 and 0.084 during the "difference check" conducted on June 27, 2005 and therefore did not have all its electronic and

operating components prescribed by its manufacturer properly attached and in good working order.

## Cases

In *Jarriel v. State*,[9] we held that the failure to test an Intoxilyzer 5000 instrument quarterly did not mandate suppression of the results of a breath test administered by use of the instrument, because the state proved substantial compliance with the requirement that the Intoxilyzer 5000 undergo periodic testing; according to the inspection certificates, the machine functioned properly when it was tested; and the officer who administered the test in that case was certified to administer breath tests and testified that the Intoxilyzer 5000 was functioning properly when he performed the test in question.[10] As thus recognized in *Jarriel*, "[r]ather than requiring exact compliance with GBI rules, we have upheld the admission of test results when the State has shown substantial compliance with the rules. Any deviation from such rule goes to the weight of the evidence, rather than its admissibility."[11]

In *Gidey v. State*[12] and *Brandon v. State*,[13] we recognized that a properly prepared and executed certificate of inspection may be used to satisfy the requirement that the state establish that the Intoxilyzer 5000 was properly maintained and in good working order. *State v. Haddock*[14] held that a certificate of inspection has been properly prepared and executed when the certificate has been signed under oath by the inspector and contains the requisite language of OCGA § 40-6-392 (f).

In *Gidey*, moreover, we held that even where the trial court had excluded the inspection certificates presented by the state, the "substantial compliance" rule allowed the state to prove through the testimony of the certified operator of the machine that the electronic and operating components prescribed by the manufacturer were properly attached and in good working order when the test was performed. Although in *Rowell v. State*,[15] we rejected the claim that DFS regulations were defective because they did not contain specific procedures to be employed in the operation and calibration of Intoxilyzer 5000 machines, we recognized that testing, calibration,

---

[9] Supra.
[10] Id. at 308 (3).
[11] Id. (footnotes omitted); see *Palmaka*, supra.
[12] 228 Ga. App. 250, 251 (1) (491 SE2d 406) (1997).
[13] Supra.
[14] 235 Ga. App. 726, 729 (2) (510 SE2d 561) (1998).
[15] Supra.

and operation of an Intoxilyzer 5000 machine may be challenged by evidence of flaws or defects.

## Appeal

In this appeal, the state contends that the trial court erred in granting Carter's motion to suppress his Intoxilyzer 5000 results because his written motion stated no facts showing how those results were unlawfully obtained and because the state satisfied the statutory requirements for admissibility.

OCGA § 17-5-30 (a) (1) authorizes a defendant aggrieved by an unlawful search and seizure to move the court to suppress as evidence anything so obtained on the ground that a search and seizure without a warrant was illegal. In his motion, styled a motion in limine, Carter in essence claimed that the Intoxilyzer's seizure of his breath samples had been unlawful because its electronic components and operating parts were not properly attached and in good working order as required by OCGA § 40-6-392. Therefore, the motion was subject to the requirements of OCGA § 17-5-30.

OCGA § 17-5-30 (b) requires the motion to be in writing and "[to] state facts showing that the search and seizure were unlawful." To meet that requirement, the motion must be "sufficient to put the state on notice as to the type of search involved (without warrant [versus] with warrant), which witness to bring to the hearing on the motion, and the legal issues to be resolved at that hearing."[16]

The basis of Carter's motion was that the Intoxilyzer 5000 used to test his breath "may not have had all of its electronic and operating components prescribed by its manufacturer properly attached and in good working order." In the motion, Carter challenged the state to show only that the Intoxilyzer 5000 had been approved by the DFS, that Officer Hester had a valid permit for operating the device, and that the test was performed in accordance with methods approved by the DFS. And Hester was the only witness presented by the state at the hearing; the implied consent area supervisor who performed the quarterly inspections on the Intoxilyzer was not called. That being the case, we find some merit in the state's claim that Carter's motion did not put it on proper notice of the witnesses to bring and legal issues to be resolved at the hearing.

But even if the contents of the motion satisfied statutory requirements, the state undisputably produced a properly prepared and executed certificate of inspection certifying that the electronic components and operating parts of the machine at issue were properly attached and in good working order. Moreover, the printout

---

[16] *Lavelle v. State*, 250 Ga. 224, 227 (3) (297 SE2d 234) (1982).

card from the Intoxilyzer's June 27, 2005 quarterly inspection showed that, during the difference check, it passed the requirement that it correctly identify and indicate sample results that differ by more than 0.02 grams; and that, during the calibration check, it passed the requirement that the difference in sequential results of samples with the same alcohol concentration not exceed 0.004 grams. In accordance with the holdings in cases such as *Jarriel*, any failure of the Intoxilyzer to have passed an operational requirement by registering a 0.074 reading in its analysis of the control solution during the difference check would go to the weight rather than admissibility of the Intoxilyzer test results. This result is particularly appropriate where, as here, the machine showed that the defendant's blood alcohol concentration was 0.175 over the legal limit, and his complaint is that the machine was calibrated in such a way as to produce a margin of error of 0.006 rather than 0.004.

*Judgment reversed. Barnes, C. J., and Johnson, P. J., concur.*

DECIDED JUNE 26, 2008.

*Fred A. Lane, Jr., District Attorney, Leslie M. Donaho, Assistant District Attorney*, for appellant.

*Allen M. Trapp, Jr.*, for appellee.