**FOURTH DIVISION**
**DOYLE, P. J.,**
**MILLER and DILLARD, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**November 18, 2014**

# In the Court of Appeals of Georgia

A14A1002. THE STATE v. PADGETT.                                    DO-037 C

DOYLE, Presiding Judge.

The State appeals from the grant of a motion to suppress filed by James Daniel Padgett after he was indicted for allegedly driving under the influence of alcohol ("DUI").[1] The State contends that the trial court erred by excluding the results of a blood test performed by a hospital because the chemical analysis of the blood failed to comply with OCGA § 40-6-392 (a) (1) (A). For the reasons that follow, we affirm.

There are

three fundamental principles which must be followed when conducting an appellate review of a trial court's ruling on a motion to suppress. First, when a motion to suppress is heard by the trial judge, that judge

---

[1] See OCGA § 40-6-391 (a) (1) (less safe to drive) & 40-6-391 (a) (5) (per se illegal alcohol concentration).

sits as the trier of facts. The trial judge hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support them. Second, the trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous. Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment. These principles apply equally whether the trial court ruled in favor of the State or the defendant.[2]

To the extent that "the evidence at a suppression hearing is uncontroverted and the credibility of witnesses is not in question, we conduct a de novo review of the trial court's application of the law to the undisputed facts."[3]

For purposes of the motion to suppress, the parties do not dispute that an ambulance took Padgett to a hospital for medical treatment after an officer responded to the scene of his motorcycle wreck. Once the officer arrived at the hospital, based on his observations of Padgett at the scene, including an alco-sensor test, the officer administered an implied consent warning and requested that Padgett submit to a blood

---

[2] (Citations and punctuation omitted.) *Brown v. State*, 293 Ga. 787, 802-803 (3) (b) (2) (750 SE2d 148) (2013), quoting *Miller v. State*, 288 Ga. 286, 286-287 (702 SE2d 888) (2010).

[3] *Jones v. State*, 291 Ga. 35, 36-37 (1) (727 SE2d 456) (2012), citing *Vansant v. State*, 264 Ga. 319, 320 (1) (443 SE2d 474) (1994).

test, and Padgett consented. At the officer's direction, Padgett's blood was drawn by a registered nurse at the hospital, but the officer did not retain the sample for testing or request that it be sent to the State crime lab. Instead, the blood sample was tested by the hospital, and the result was entered into Padgett's medical record. Thereafter, the officer obtained a search warrant for Padgett's medical record, and Padgett moved to suppress the result of the blood test.

The trial court received letter briefs on the admissibility of the test result, and after initially denying Padgett's motion, the court convened two re-hearings to address a factual discrepancy that had arisen.[4] With the facts clarified, the State conceded that the hospital's analysis of Padgett's blood sample did not comply with the requirements of OCGA § 40-6-392 (a) (1) (A), but the State argued that the test was otherwise admissible. The trial court granted the motion to suppress, giving rise to this appeal by the State.

---

[4] When first briefing the issue, Padgett's counsel was operating under the assumption that the officer had lost the initial blood sample, and the medical record did not reflect the particular blood test requested by the officer. The parties later learned that the officer never lost the sample and never attempted to submit it for State-administered testing. Instead, he intentionally left it to be tested by the hospital, and that result was entered into Padgett's medical record.

1. The trial court based its ruling on OCGA § 40-6-392 (a), which provides as follows, in relevant part:

(a) Upon the trial of any civil or criminal action or proceeding arising out of acts alleged to have been committed by any person in violation of Code Section 40-6-391, evidence of the amount of alcohol or drug in a person's blood, urine, breath, or other bodily substance at the alleged time, as determined by a chemical analysis of the person's blood, urine, breath, or other bodily substance shall be admissible. Where such a chemical test is made, the following provisions shall apply:

(1) (A) Chemical analysis of the person's blood, urine, breath, or other bodily substance, to be considered valid under this Code section, shall have been performed according to methods approved by the Division of Forensic Sciences of the Georgia Bureau of Investigation on a machine which was operated with all its electronic and operating components prescribed by its manufacturer properly attached and in good working order and by an individual possessing a valid permit issued by the Division of Forensic Sciences for this purpose. The Division of Forensic Sciences of the Georgia Bureau of Investigation shall approve satisfactory techniques or methods to ascertain the qualifications and competence of individuals to conduct analyses and to issue permits, along with requirements for properly operating and maintaining any testing instruments, and to issue certificates certifying that instruments have met those requirements, which certificates and

4

permits shall be subject to termination or revocation at the discretion of the Division of Forensic Sciences.

In *Perano v. State*,[5] the Supreme Court of Georgia explained the purpose of the statute: "This [C]ode section provides for the procedures to be used where the [S]tate administers the test."[6] Thus, if a State-administered test complies with the statutory requirements in OCGA § 40-6-392 (a), the test results "shall be admissible,"[7] and conversely, if the State-administered test does not comply with the statute, it is inadmissible.[8] The question in this case is whether these statutory requirements apply to a blood test requested by a law enforcement officer but analyzed by a hospital. We conclude that they do.

---

[5] 250 Ga. 704 (300 SE2d 668) (1983).

[6] (Emphasis supplied.) Id. at 707. See also *State v. Carter*, 292 Ga. App. 322, 323 (665 SE2d 14) (2008) ("This Code section . . . provides that for the *state-administered* test to be considered valid, it must be conducted" in accordance with the statutory requirements.) (emphasis supplied); *Dixon v. State*, 227 Ga. App. 533, 534 (2) (489 SE2d 532) (1997) ("These procedures apply only to *State-administered* tests . . . .").

[7] OCGA § 40-6-392 (a).

[8] See *Carter*, 292 Ga. App. at 323.

Georgia cases have consistently characterized tests requested by an officer as "State-administered." For example, in *Oldham v. State*,[9] this Court explained that "the procedures outlined in [OCGA § 40-6-392] are limited to those tests *performed at the request or direction of a law enforcement officer*. When an alcohol level concentration test is performed at the request or direction of a law enforcement officer and complies with the dictates of that statute, it is admissible."[10] On the other hand, the Court explained, some other situations present a scenario where a blood test is not done at the direction of a law enforcement officer (such as during medical treatment), and "[t]hose tests are not subject to the dictates of OCGA § 40-6-392[, so] the party seeking to admit the test results must satisfy the court that the results are admissible pursuant to the rules of evidence."[11]

Here, it is undisputed that the blood analysis at issue was performed at the request of a law enforcement officer for the purpose of a DUI investigation pursuant

---

[9] 205 Ga. App. 268 (422 SE2d 38) (1992).

[10] (Citation omitted; emphasis supplied.) Id. at 269 (1).

[11] Id. See also *Daniel v. State*, 298 Ga. App. 245 (679 SE2d 811) (2009) (addressing the admissibility of two tests, one non-State administered test done by the hospital for medical treatment, and one State-administered test requested at the hospital by an officer two hours later).

to consent gained after an implied consent warning. Thus, the test was State-administered for purposes of OCGA § 40-6-392 (a), and the State had the burden of showing that it met the statutory requirements, which it concedes it could not do.[12]

2. The State also contends that even if the test did not comply with statutory requirements, it was otherwise admissible through the inevitable discovery doctrine because the officer later obtained a warrant for Padgett's medical record, which contained the test result. "[T]he . . . inevitable discovery doctrine allows admission of evidence that was discovered as a result of police error or misconduct if the State establishes by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means, *without reference to the police error* or misconduct."[13] Here, we discern no intentional misconduct on the part of the police, but it remains true that the blood test at issue did not meet the statutory requirements, so this constituted police error. Even if the police were entitled to discover the result of the blood test by lawfully obtaining a warrant for Padgett's

---

[12] See *Dixon v. State*, 227 Ga. App. 533, 534 (2) (489 SE2d 532) (1997) (drawing a distinction between a test requested by an officer and a test performed by a hospital during medical treatment). See also *Perano*, 250 Ga. at 708 (referring to a test performed at a hospital at the request of an officer as "the [S]tate's test.").

[13] *State v. Nesbitt*, 305 Ga. App. 28, 36 (2) (c) (699 SE2d 368) (2010).

medical record, this did not change the fact that the result in the medical record was from a procedure that failed to comply with OCGA § 40-6-392 (a), which governs the admissibility of State-administered blood alcohol tests. Thus, the presence of a warrant did not cure the improper testing procedure that occurred in this case. Accordingly, the inevitable discovery doctrine does not provide an avenue for admission.

*Judgment affirmed. Miller and Dillard, JJ., concur*.