**FOURTH DIVISION**
**DILLARD, P. J.,**
**RAY and SELF, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**May 31, 2017**

# In the Court of Appeals of Georgia

A17A0633. HYNES v. THE STATE.

SELF, Judge.

James Hynes was charged with failure to maintain lane, driving under the influence of alcohol (DUI) less safe, and DUI per se. He filed a motion to suppress the results of a blood test administered pursuant to a search warrant. Following a hearing, the trial court denied the motion. We granted Hynes's application for interlocutory appeal, and after reviewing the record and hearing transcript, we affirm for the reasons set forth below.

The evidence in this case shows that on April 6, 2016, a deputy with the Cherokee County Sheriff's Office observed Hynes weaving across the center line of Bells Ferry Road. The deputy conducted a traffic stop and smelled a "heavy odor of alcohol" on Hynes's breath. During his conversation with the deputy, Hynes first

stated he had consumed "zero" alcohol, but later admitted to drinking two glasses of wine. Hynes refused to participate in field sobriety testing, but eventually let the officer perform the horizontal gaze nystagmus test, in which Hynes exhibited all six indicators. The deputy placed Hynes under arrest, read the implied consent notice for drivers over the age of 21, and then asked Hynes if he would submit to a blood test. Hynes refused the state-administered test, but stated that he would "do an independent test." The deputy obtained and executed a search warrant for a blood test. The deputy testified that he did not permit Hynes to obtain an independent test because "he refused implied consent."

The transcript of the hearing on the motion to suppress includes the following colloquy between the State and the deputy:

Q: What was his answer to the implied consent card?
A: He refused State testing.
Q: Did he ever ask for an independent test?
A: He never directly asked for one, no.
Q: Okay. Did you take him to get an independent test?
A: I did not, as he refused implied consent.

Later, the following exchange occurred between Hynes's attorney and the deputy:

Q: Now, let's talk about after you arrest him and you read him implied consent, he tells you in response that he'll do an independent test, is that right?

2

A: Uh-huh. . . Yes, ma'am, he does.

Q: And do you recall hearing him on the video say, you asked him to confirm, you will do an independent test? Do you remember asking him that?

A: Yes, I believe that's on the video.

Q: And he responded, yes. Is that right?

A: He said he would do an independent test, yes, ma'am.

Q: Okay. At any point thereafter was a test administered in this case?

A: A test was administered after a search warrant was completed.

Q: Okay. And what kind of test was that?

A: It was a blood test.

Q: All right. And after the blood test was administered, was there any effort made to accommodate an independent test?

A: No, ma'am, because he refused implied consent.

Hynes moved to suppress the results of the blood test because the deputy refused to honor his request for an independent test. Hynes argued that his right to an independent test under OCGA § 40-6-392 (a) (3) is not contingent upon his submission to a state-administered test. The trial court denied the motion, ruling that a "[d]efendant's right to an independent test accrues only upon the [d]efendant's consent to the State's test as requested after the reading of the [i]mplied [c]onsent card."

In his sole enumeration of error, Hynes contends that the trial court erred in ruling that OCGA § 40-6-392 (a) (3) does not grant a driver the right to an independent test when the officer obtains a search warrant for a blood test. Hynes

3

argues that the trial court should have granted his motion to suppress the results of the blood test performed pursuant to a search warrant because OCGA § 40-6-392 (a) (3) merely requires that a test be administered at the direction of a law enforcement officer before the right to an independent test accrues and does not make an exception for chemical tests administered pursuant to search warrants. In other words, according to Hynes, he was entitled to an independent test because under the plain language of OCGA § 40-6-392 (a) (3), a chemical test performed pursuant to a search warrant comes within the definition of "any administered at the direction of a law enforcement officer."

The State argues that OCGA § 40-6-392 (a) (3) does not create the right to an independent test for defendants whose blood is drawn pursuant to a search warrant. The State points out that OCGA § 40-6-392 (a) does not apply in its entirety to cases where a chemical test was conducted pursuant to a search warrant. The State also contends that OCGA § 40-6-392 (a) (3) must be read in concert with subsection (a) (4) (requiring an implied consent warning to be read) and OCGA § 40-5-67.1 (containing the language of the warning), which make clear that an independent test is triggered only after a defendant consents to take a test pursuant to the implied consent statute.

4

The question of whether a DUI suspect has the right to an independent test when that suspect refuses a test under the implied consent law, but is then tested pursuant to a search warrant, appears to be one of first impression in Georgia.[1] We conduct a de novo review of the trial court's negative answer to this question. *Jones v. State*, 291 Ga. 35, 36-37 (1) (727 SE2d 456) (2012) ("When the evidence at a suppression hearing is uncontroverted and the credibility of witnesses is not in question, we conduct a de novo review of the trial court's application of the law to the undisputed facts."). We begin our analysis by delineating a few basic principles related to implied consent and the rules of statutory construction.

---

[1] While our appellate courts have never addressed this exact issue, we have held that "[t]he statutory right to an alternate test by a person of the defendant's own choosing does not attach until the State has performed its test." *Modlin v. State*, 176 Ga. App. 83 (335 SE2d 312) (1985), citing *Huff v. State*, 144 Ga. App. 764 (242 SE2d 361) (1978).

*Implied Consent*

In *Williams v. State*, 296 Ga. 817 (771 SE2d 373) (2015), the Georgia Supreme Court explained that

> [a DUI] suspect's right under the Fourth Amendment to be free of unreasonable searches and seizures applies to the compelled withdrawal of blood, and the extraction of blood is a search within the meaning of the Georgia Constitution. In general, searches are of two types: those conducted with a search warrant or those undertaken without one, and searches conducted outside the judicial process are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions.

(Citations and punctuation omitted.) Id. at 819. The United States Supreme Court in *Schmerber v. California,* 384 U. S. 757 (86 SCt 1826, 16 LEd2d 908) (1966), recognized the presence of "exigent circumstances" as the first exception to the warrant requirement in the context of a blood test taken by a physician while defendant was in the hospital after being arrested, ruling that a warrantless blood draw may be appropriate where the officer was confronted with an emergency which threatened "'the destruction of evidence.'" Id. at 770-771 (IV). See also *Missouri v. McNeely*, __ U. S. __ (133 SCt 1552, 185 LE2d 696) (2013) (rejecting per se rule of admissibility of warrantless blood draws based upon exigent circumstances). Another

exception to the warrant requirement is a search pursuant to consent. See *Cooper v. State*, 277 Ga. 282, 291 (VI) (587 SE2d 605) (2003). Georgia's implied consent law is based on this exception. See id.

In codifying Georgia's implied consent law, our General Assembly declared as a matter of law that persons in control of any moving vehicle while having an illegal blood alcohol concentration "constitute[] a direct and immediate threat to the welfare and safety of the general public." OCGA § 40-5-55. Accordingly,

> any person who operates a motor vehicle upon the highways or elsewhere throughout this state shall be deemed to have given consent, subject to Code Section 40-6-392, to a chemical test or tests of his or her blood, breath, urine, or other bodily substances for the purpose of determining the presence of alcohol or any other drug, if arrested for any offense arising out of acts alleged to have been committed in violation of Code Section 40-6-391 or if such person is involved in any traffic accident resulting in serious injuries or fatalities. The test or tests shall be administered at the request of a law enforcement officer having reasonable grounds to believe that the person has been driving or was in actual physical control of a moving motor vehicle upon the highways or elsewhere throughout this state in violation of Code Section 40-6-391. The test or tests shall be administered as soon as possible to any person who operates a motor vehicle upon the highways or elsewhere throughout this state who is involved in any traffic accident resulting in serious injuries or fatalities. Subject to Code Section 40-6-392, the

7

requesting law enforcement officer shall designate which of the test or tests shall be administered, provided a blood test with drug screen may be administered to any person operating a motor vehicle involved in a traffic accident resulting in serious injuries or fatalities.

Id. This Code section is part of the implied consent statutory scheme which also includes OCGA §§ 40-5-67.1 and 40-6-392. See *Massey v. State*, 331 Ga. App. 430, 431-434 (771 SE2d 122) (2015).

OCGA § 40-5-67.1 provides the specific implied consent notice to be given by the officer to the driver, including "information regarding consequences for refusing the testing requested by the officer, and the driver's right to obtain additional chemical testing after submitting to the testing requested by the officer." *Massey*, supra at 430-433 (1). And OCGA § 40-6-392 governs the admissibility of chemical tests in cases alleging the violation of OCGA § 40-6-391, including regulating the procedures and methodology of chemical analysis,[2] and provides in relevant part:

---

[2] See *Perano v. State*, 250 Ga. 704, 707 (2) (300 SE2d 668) (1983) ("[C]ode section [OCGA § 40-6-392] provides for the procedures to be used where the [S]tate administers the [alcohol concentration] test."). A State-administered test that complies with the procedures outlined in the Code section is admissible; conversely, a State-administered test that does not comply with the statute is inadmissible. See *State v. Padgett*, 329 Ga. App. 747, 750 (1) (766 SE2d 143) (2014).

8

(a) Upon the trial of any civil or criminal action or proceeding arising out of acts alleged to have been committed by any person in violation of Code Section 40-6-391, evidence of the amount of alcohol or drug in a person's blood, urine, breath, or other bodily substance at the alleged time, as determined by a chemical analysis of the person's blood, urine, breath, or other bodily substance shall be admissible. Where such a chemical test is made, the following provisions shall apply:

(1) (A) Chemical analysis of the person's blood, urine, breath, or other bodily substance, to be considered valid under this Code section, shall have been performed according to methods approved by the Division of Forensic Sciences of the Georgia Bureau of Investigation on a machine which was operated with all its electronic and operating components prescribed by its manufacturer properly attached and in good working order and by an individual possessing a valid permit issued by the Division of Forensic Sciences for this purpose. The Division of Forensic Sciences of the Georgia Bureau of Investigation shall approve satisfactory techniques or methods to ascertain the qualifications and competence of individuals to conduct analyses and to issue permits, along with requirements for properly operating and maintaining any testing instruments, and to issue certificates certifying that instruments have met those requirements, which certificates and permits shall be subject to termination or revocation at the discretion of the Division of Forensic Sciences. . . .

(2) When a person shall undergo a chemical test at the request of a law enforcement officer, only a physician, registered nurse, laboratory

technician, emergency medical technician, or other qualified person may withdraw blood for the purpose of determining the alcoholic content therein, provided that this limitation shall not apply to the taking of breath or urine specimens. No physician, registered nurse, or other qualified person or employer thereof shall incur any civil or criminal liability as a result of the medically proper obtaining of such blood specimens when requested in writing by a law enforcement officer;

(3) The person tested may have a physician or a qualified technician, chemist, registered nurse, or other qualified person of his own choosing administer a chemical test or tests in addition to any administered at the direction of a law enforcement officer. The justifiable failure or inability to obtain an additional test shall not preclude the admission of evidence relating to the test or tests taken at the direction of a law enforcement officer; and

(4) Upon the request of the person who shall submit to a chemical test or tests at the request of a law enforcement officer, full information concerning the test or tests shall be made available to him or his attorney. The arresting officer at the time of arrest shall advise the person arrested of his rights to a chemical test or tests according to this Code section. . . .

OCGA § 40-6-392 (a). As the United States Supreme Court noted in *Birchfield v. North Dakota*, 579 U. S. __ (136 SCt 2160, 195 LEd2d 560) (2016):

Drunk drivers take a grisly toll on the Nation's roads, claiming thousands of lives, injuring many more victims, and inflicting billions of dollars in property damage every year. To fight this problem, all States have laws that prohibit motorists from driving with a blood alcohol concentration (BAC) that exceeds a specified level. But determining whether a driver's BAC is over the legal limit requires a test, and many drivers stopped on suspicion of drunk driving would not submit to testing if given the option. So every State also has long had what are termed "implied consent laws." These laws impose penalties on motorists who refuse to undergo testing when there is sufficient reason to believe they are violating the State's drunk-driving laws.

136 SCt at 2166.

Like many other states, Georgia relies upon incentives and penalties in the implied consent law to encourage DUI suspects to submit to State-administered testing. In *State v. Simmons*, 270 Ga. App. 301 (605 SE2d 846) (2004) (physical precedent only), we noted that Georgia's implied consent law offers two choices to DUI suspects: "(1) submit to State-administered chemical testing with right to independent testing, if desired, or (2) refuse State testing, suffering the attendant evidentiary consequences."[3] Id. at 303. See also *Padidham v. State*, 291 Ga. 99 (728

---

[3] United States Supreme Court opinions "have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply." *Birchfield*, supra, 136 SCt at 2185

11

SE2d 175) (2012). In *Padidham*, our Supreme Court recognized that the obligation placed on the officer by the implied consent statute is intended to protect the DUI suspect: "[O]ne cannot make an intelligent choice to submit to a chemical test without the knowledge of the right to have an independent test." (Citation and punctuation omitted.) Id. at 101 (2).

> [T]he choice to submit or refuse to submit to the analysis of one's blood, breath, urine or other bodily substance will not be an easy or pleasant one to make, "but the criminal process often requires suspects and defendants to make difficult choices." DUI defendants similarly must determine, often under difficult and stressful circumstances, whether to request an independent test.[4]

Id. at 102-103 (2), citing *South Dakota v. Neville*, 459 U. S. 553, 560 (II) (103 SCt 916, 74 LEd2d 748) (1983).

In *Neville*, the United States Supreme Court held that "the admission into evidence of a defendant's refusal to submit to [a blood-alcohol test] does not offend

---

(VI), citing *McNeely*, supra, 133 SCt 1552; *South Dakota v. Neville*, 459 U. S. 553, 560 (II) (103 SCt 916, 74 LEd2d 748) (1983).

[4] "An officer is permitted to attempt to persuade an individual to submit to a field-sobriety test, so long as in doing so the officer makes no threat of criminal sanction or any show of force that would improperly compel a suspect into submitting to the tests." (Citation omitted and punctuation omitted.) *State v. Mosley*, 321 Ga. App. 236, 237, n. 4 (739 SE2d 106) (2013).

12

the right against self-incrimination." *Neville*, supra, 459 U. S. at 554. The Court

reasoned that a DUI suspect's right to refuse chemical testing was not a right of

"constitutional dimension," but "simply a matter of grace bestowed by the South

Dakota legislature." Id. at 565 (III).[5] The defendant in *Neville* argued that admission

into evidence of his refusal to take a blood-alcohol test violated the Due Process

Clause in much the same way that the Due Process Clause forbids the state from

using the defendant's silence after a Miranda warning against him at trial. Id. at 564

(III). The Court rejected this argument finding that

> the *Miranda* warnings emphasize the dangers of choosing to speak
> ("whatever you say can and will be used as evidence against you in
> court"), but give no warning of adverse consequences from choosing to
> remain silent. This imbalance in the delivery of *Miranda* warnings,
> [however], implicitly assures the suspect that his silence will not be used
> against him. The warnings challenged here, by contrast, contained no
> such misleading implicit assurances as to the relative consequences of
> his choice. The officers explained that, if respondent chose to submit to
> the test, he had the right to know the results and could choose to take an
> additional test by a person chosen by him.

---

[5] In *Padidham*, supra, the Georgia Supreme Court adopted the United States Supreme Court's language from *Neville* in relation to OCGA § 40-6-392: "a defendant's right to an independent test, a right created by § 40-6-392 (a) (3), is not one of constitutional dimension but a 'matter of grace' bestowed by the Georgia legislature." 291 Ga. at 101 (2).

Id. at 565 (III). The Court also pointed out that the warning that the State could revoke the DUI suspect's license for one year "made it clear that refusing the test was not a 'safe harbor,' free of adverse consequences." Id. at 566 (III). The caselaw interpreting implied consent laws demonstrates that the judiciary overwhelmingly sanctions the use of civil penalties and evidentiary consequences against DUI suspects who refuse to comply.

*Statutory Construction*

Our consideration of Hynes's enumeration of error requires application of the elementary rules of statutory construction.

> [I]n considering the meaning of a statute, our charge as an appellate court is to presume that the General Assembly meant what it said and said what it meant. Thus, we must afford the statutory text its plain and ordinary meaning, consider the text contextually, read the text in its most natural and reasonable way, as an ordinary speaker of the English language would, and seek to avoid a construction that makes some language mere surplusage. Importantly, when the language of a statute is plain and susceptible of only one natural and reasonable construction, courts must construe the statute accordingly.

(Citations, punctuation and footnotes omitted.) *Wright v. Brown*, 336 Ga. App. 1, 3 (2) (783 SE2d 405) (2016). See also *Deal v. Coleman*, 294 Ga. 170, 171 (1) (a) (751

14

SE2d 337) (2013). Additionally, when a statute is part of a statutory scheme, as in this case, it must be analyzed in relation to other statutes of which it is a part. As our Supreme Court has explained,

> in our search for the meaning of a particular statutory provision, we look not only to the words of that provision, but we consider its legal context as well. After all, context is a primary determinant of meaning. For context, we may look to the other provisions of the same statute, the structure and history of the whole statute, and the other law – constitutional, statutory, and common law alike – that forms the legal background of the statutory provision in question. This is what we mean when we speak of discerning "the intent of the legislature," as that "intent" is reflected in the relevant statutory text and its contextual backdrop.

(Citations, punctuation and footnotes omitted.) *Algren v. State*, 330 Ga. App. 1, 7 (3) (764 SE2d 611) (2014).

*Analysis*

Bearing in mind the principles of implied consent and statutory construction, we now consider the question of whether a DUI suspect has the right to an independent test when that suspect refuses testing under the implied consent law but is then tested pursuant to a search warrant. As noted previously, Hynes contends that

15

he was entitled to an independent test because under the plain language of OCGA § 40-6-392 (a) (3), a chemical test performed pursuant to a search warrant comes within the definition of "any administered at the direction of a law enforcement officer." We are not persuaded by this contention.

The caselaw discussed above demonstrates that under implied consent law, a DUI suspect has the option of accepting or refusing the state-administered test, after being advised of the attendant consequences for both choices. The law provides for penalties, including license revocation and admission into evidence the refusal to submit to state-administered testing, but also offers a DUI suspect an incentive "carrot" of additional testing after accepting the required state-administered chemical testing. In *Neville*, supra, the United States Supreme Court implicitly approved the use of such an incentive, which we interpret conversely: If a DUI suspect chooses not to take the state-administered test, he or she is *not* entitled to take advantage of the "additional test" incentive. As we noted above, the choice to submit or refuse testing is not an easy or pleasant one to make, but the criminal process often requires suspects and defendants to make hard choices, some of which will result in adverse consequences, some of which will result in favorable consequences. Contrary to Hynes's contention, Georgia's implied consent warning has everything to do with

16

whether he was entitled to an independent blood test; if he chose to submit to state-administered testing as provided by the implied consent notice, he would be entitled to take advantage of the incentive offered. He refused to submit to the required State-administered test and must, therefore, suffer the adverse consequences of that choice. This result is consistent with our existing law that defendants forfeit their "right to such independent testing by refusing the arresting officer's request to submit to a state-administered breath test after being advised under OCGA § 40-5-67.1." *Clegg v. State*, 236 Ga. App. 115 (511 SE2d 544) (1999).

Reading the statute in the manner suggested by Hynes would vitiate the nature of independent testing as an incentive for accepting state-administered testing under implied consent, and effectively frustrate the intended effect of Georgia's implied consent law. When OCGA § 40-6-392 (a) (3) is read in the context of the entire statutory scheme for implied consent, it is clear that "the person tested" in subsection (a) (3) refers to a person tested pursuant to implied consent. Construing it any other way would render meaningless the language in the implied consent notice.[6] OCGA § 40-5-67.1 (b) (3) ("After first submitting to the required [S]tate tests, you are

---

[6] In light of this construction, we need not consider Hynes's contention regarding the legislature's use of the words "undergo" and "submit" in other subsections of OCGA § 40-6-392 (a).

17

entitled to additional chemical tests of your blood, breath, urine, or other bodily substances at your own expense.").

If the General Assembly had intended OCGA § 40-6-392 to grant a DUI suspect the right to an independent test after an officer obtains a search warrant for a chemical test, it could have expressly provided that right. Instead, in the statutory text, our General Assembly used an independent test as an incentive for a DUI suspect to submit to the required State test under implied consent. The crux of Hynes's argument in this case is that he was *entitled* to an independent test under the statute upon demand. But, the Georgia Supreme Court in *Padidham*, supra, made clear that the right to an independent test is not an entitlement, but rather, "a matter of grace bestowed by the Georgia legislature" upon one who submits to the required state-administered test under implied consent. 291 Ga. at 101 (2).

Hynes's claim fails for another reason as well. As noted above, OCGA § 40-6-392 (a) (3) provides, in pertinent part, that "[t]he person tested may have a physician or a qualified technician, chemist, registered nurse, or other qualified person of his own choosing administer a chemical test or tests in addition to any administered at the *direction of a law enforcement officer*." (Emphasis supplied.) Here, Hynes's blood was drawn pursuant to a search warrant. A search warrant is issued at the command

18

or direction of a judicial officer, not at the direction of a law enforcement officer. See

OCGA § 17-5-20 et seq. See also *Hawkins v. State*, 130 Ga. App. 426, 427 (2) (203

SE2d 622) (1973) (reversing denial of motion to suppress where magistrate judge,

who was also county law enforcement officer, issued search warrant; under doctrine

of separation of powers, person seeking search warrant, an executive officer, and

person issuing search warrant, a judicial officer, cannot be one in the same). When

presented with a proper affidavit, it is ultimately up to a judicial officer to determine

whether probable cause exists to issue a search warrant:

> Upon the written complaint of any certified peace officer of this state or its political subdivisions charged with the duty of enforcing the criminal laws and otherwise as authorized in Code Section 17-5-20 under oath or affirmation, which states facts sufficient to show probable cause that a crime is being committed or has been committed and which particularly describes the place or person, or both, to be searched and things to be seized, any judicial officer authorized to hold a court of inquiry to examine into an arrest of an offender against the penal laws, referred to in this Code section as "judicial officer," may issue a search warrant. . . . OCGA § 17-5-21 (a).

Construing the plain language of OCGA § 40-6-392 (a) (3), it is apparent that

it applies only to tests administered at the direction of a law enforcement officer, not

tests administered pursuant to a search warrant, which by definition are issued at the

19

direction of a judicial officer. So, while subsection 40-6-392 (a) (1) (A) applies to chemical tests performed pursuant to search warrants, subsection (a) (3) does not. To hold that the statute, in its silence, applies to tests administered at the direction of a judicial officer would require us to add words not found in the statute. This, we will not do. Reading the statute in this manner is also consistent with our conclusion that an independent test is an incentive for accepting testing under implied consent.

Hynes points out that "there is something perverse about allowing officers to use a search warrant to avoid providing an independent test even if a motorist may have submitted." We are not persuaded by this argument. Because the effort of obtaining a search warrant is time-consuming and the requirements strict and exacting,[7] we do not accept Hynes's argument that law enforcement officers will abuse that power in an effort to trick DUI suspects into forfeiting their right to an independent test. Indeed, the facts of this case demonstrate that officers will first seek to use the implied-consent procedure.

Hynes further contends that denying an independent test to a DUI suspect who is tested pursuant to a search warrant creates an absurd result whereby only those who

---

[7] See generally *King v. State*, 276 Ga. 126, 128 (2) (577 SE2d 764) (2003), (discussing requirements for issuance of search warrants).

20

waive their Fourth Amendment rights would be entitled to have their blood drawn by qualified medical personnel. The facts of this case, however, do not require us to address this scenario. But see *Jackson v. State*, 340 Ga. App. 228 (2) (797 SE2d 152) (2017) (under implied consent, there is no requirement that a chemical analysis of blood to detect the presence of drugs be performed by "qualified medical personnel").

In sum, because Hynes refused to submit to the chemical testing requested by the arresting officer pursuant to OCGA § 40-5-55, he was not entitled to an independent test, and the trial court properly denied his motion to suppress the results of the blood test performed pursuant to a search warrant.[8]

*Judgment affirmed. Dillard, P. J., and Ray, J., concur.*

---

[8] We render no opinion as to whether Hynes may be entitled to subpoena the sample of his blood for independent testing. See generally *Townsend v. State*, 236 Ga. App. 530 (511 SE2d 587) (1999) (noting with approval trial court's decision to allow defense expert to independently test sole blood sample).